UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JOHN MCGLONE, and JEREMY PETERS, as individuals, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) No. 3:16-cv-00739 ) CHIEF JUDGE CRENSHAW |
| THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, | ) ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM

This litigation arose out of events during the Nashville Pride Festival in 2015. Pending are the fully briefed Motions for Summary Judgment filed by Defendant the Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro") (Doc. No. 54) and by Plaintiffs John McGlone and Jeremy Peters (Doc. No. 60). *The Court heard oral argument on the cross motions on September 27, 2017.* For the reasons that follow, Metro's Motion will be granted and Plaintiffs' Motion will be denied.

### I. Factual Background

The parties have filed separate Statements of Fact in support of their respective Motions (Doc. Nos. 56, 62), as well as responses (Doc. Nos. 67, 69). Although their presentations differ, the relevant facts are not in dispute and are as follows:

On June 26 to 27, 2015, the Nashville Pride Festival ("Festival") was held at Public Square Park, which sits directly in front of the historic Metro Courthouse in downtown Nashville. Nashville

Pride's "message or mission" is "to celebrate the culture and community of the LGBTQ[1] people in Nashville in a safe space." (Doc. No. 69 ¶ 1). The Festival is used to disseminate that message to the public. (Id. ¶ 2).

Promoter Jack Davis, through his company J.D. Events and Festivals, applied for and received a special events permit for the Festival by submitting an application to Metro and completing a checklist. (Id. ¶ 8). Among the items on the checklist was a security action plan, which was completed by Comprehensive Security ("Comprehensive"), a private security company, and approved by the Metropolitan Nashville Police Department ("MNPD"). (Id.; Doc. No. 67 ¶ 27). The placement of fencing, barricades and street closures was a part of the security action plan that was approved. (Doc. No. 67, ¶¶ 33, 34, 37).

Also as part of the application process for the Festival permit, J.D. Events was required to provide a community notification letter. That letter identified MNPD Lieutenant David Corman (who was involved in the security action plan approval) as a contact person for any questions related to security, and Rory Rowan of Metro Nashville Public Works as a contact person for questions related to street closures. (Id. ¶¶ 32, 33).

The security officers provided by Comprehensive were either retired or active duty police officers from other jurisdictions. (Id. ¶ 39). No Metro Police Department officers worked off duty for Comprehensive to provide security for the Festival. (Doc. No. 69, ¶ 10). Nevertheless, all of these officers wore uniforms that identified them as police or law enforcement officers, and they were required to comply with MNPD's policies and procedures. (Doc. No. 67, ¶¶ 40, 41).

The Festival was a ticketed event, with ingress and egress made through several gates around

---

[1] LGBTQ is an initialism for lesbian, gay, bisexual, transgender, and queer or questioning.

the perimeter of Public Square. Fencing and barricades were placed at various locations to control access, but the permitted area expanded beyond those points to allow queuing lines to form. This included the sidewalk plaza area near the fountains in front of Public Square Park (Doc. No. 69 ¶¶ 21, 22).

Plaintiffs McGlone and Peters are street preachers who believe that homosexuality is a sin. (Doc. No. 69 ¶ 3, 4, 6). They regularly engage in activities to share their religious message with others, and preach using bullhorns and amplification equipment to get their message across. (Doc. No. 69, ¶ 7). They went to the Festival on June 27, 2015 to share a message that was contradictory to the message of Nashville Pride and the Festival. (Doc. No. 67, ¶¶ 2-3).

After meeting in a parking garage adjacent to the Festival grounds, Plaintiffs took an elevator to the plaza area, but did not attempt to enter the ticketed area. Instead, they stopped on the public sidewalk area outside the gate. This area was permitted (that is, within the permit area) but not inside the barricaded, gated area. The public was not banned from this sidewalk area, nor did anyone have to pay to enter this area. (Id. ¶¶ 5, 7, 8-10).

After preaching for a matter of minutes, Plaintiffs were approached by Josh Crowe who was employed by Comprehensive. (Id. ¶ 6). Crowe told Plaintiffs that they were not allowed to be in the public area outside the gate and told them to leave the sidewalk area or they would be arrested. (Id. ¶ 10).

Crowe did not direct anyone other than the Plaintiffs to leave, even though others were standing around in the same vicinity. Those expressing a viewpoint favorable to the festival were allowed to stay on the sidewalk area in front of the event. (Id. ¶¶ 11, 12).

Faced with the threat of arrest, Plaintiff eventually retreated to the sidewalk corner of Third

Avenue and Union Street. (Id. ¶ 13).[2] Enroute to the sidewalk of Third and Union Street, they stopped at a triangular area and marks the turning lane for motorists turning right from Union onto Third. It has no benches or gazebos, and no plaques or displays related to Nashville's history. (Doc. No. 69, ¶ 27).

At this point it is useful to display the map from the Festival that illustrates the venue:

---

[2] *At the hearing, the parties agreed that Plaintiffs first began preaching on permitted area in front of the tent and slightly to the left of the "Bike Check" area, which is in the middle and on the right hand side of the map. They then moved across Union Street and began preaching from the corner of Union Street and Second Avenue. This second location is not depicted on the map, but is roughly parallel with the "Bike Check," and across Union Street. From there, they moved to the median on Third Avenue and Union, which is the triangular shaped area in the lower, right hand corner of the map. Finally, they moved to the sidewalk corner of Union Street and Third Avenue, which is below the median and across Third Avenue.*



(Doc. No. 54-5, Festival Map).

Returning to the narrative, upon moving to the median, Plaintiffs were again approached by Crowe who told them they could not preach there either and that they would be arrested if they

remained. (Doc. No. 69, ¶ 14).³ No one from Metro or the MNPD spoke to Plaintiffs about moving either from the plaza, or the median. (Id. ¶ 13). With regard to Crowe's handling of the situation and the instructions that were provided by the MNPD, Loyd Poteete, the owner of Comprehensive, testified:

> Q. What sort of instructions do you offer?
>
> A. We ask the police department for their guidance on how they want to handle it. They tell us what's permitted, people cannot be in the streets blocking traffic. They can only stop traffic to help people back and forth across, but no one can stay in the street. And if they can't go in the event, they can't go in the event, but that's it. And then we make sure nobody gets hurt.
>
> Q. Uh-huh. What if they can't go into the event or they're not choosing to go into the event? Is that a situation where they have to be –
>
> A. They have to go out of the street. And if the street is permitted and blocked off, they can't be in the street; they have to go to the far side.
>
> Q. And those are instructions that you would receive on how to handle that situation from the Metro Police Department?
>
> A. Yes, sir.

(Doc. No. 67, ¶¶ 15, 45).

Plaintiffs moved from the median to outside the fenced area on the sidewalk of Third Avenue and Union Street and resumed preaching. They preached at that location for the next four to five hours. (Doc. No. 69, ¶ 23). While Plaintiffs preached at the location across the street from the Festival, crowds would "gather and leave and gather and leave." (Id. ¶ 24). Many of those that gathered around Plaintiffs were antagonistic to the message being preached, and Plaintiffs were aware that physical violence

---

³ Comprehensive security officers had the power to detain, but not arrest. If they believed an arrest was warranted, they were required to contact an MNPD officer, and it was up to that department to determine whether an arrest should be made. (Id. ¶¶ 42-43).

was always a possibility. (Id. ¶¶ 16, 17).

Plaintiffs have attended the Festival in the past, but have never applied for a special events permit. (Id. ¶ 19). Prior to the 2015 Festival, however, Peters sent an e-mail to Lt. Corman informing him that he intended to preach outside–but on the same side of the street–as the Festival. (Doc. No. 67, ¶ 47). Corman responded: "The organizers secured a sidewalk lane and road closure surrounding the event side, and it would appear that you need to conduct your activities on the other side of the road." (Id. ¶ 48). This email exchange was forwarded to Poteete who, in turn, relayed it to his security officers and notified them that, according to the MNPD, Plaintiffs were to remain on the opposite side of the street from the Festival. (Id. ¶ 49).

Plaintiffs' preference was to preach from the permitted plaza or median because they would be heard by more people. The location at Second Avenue and Union, across the street from the plaza, they believe, interfered with their message because of "deflection" and the noise of passing vehicular traffic. (Id. ¶¶ 17, 18).

At some point after Plaintiffs had moved from the median, MNPD Sergeant Bryan Petty arrived and spoke to them at the request of Officer Crowe. Sgt. Petty told Plaintiffs that, as long as they stayed on the sidewalk of Third Avenue and Union Street across from the Festival they were fine, but would face arrest if they crossed the street. (Id. ¶ 19, 20).

Sgt. Petty testified in his deposition that, while he personally disagreed with the directive he gave Plaintiffs, he was instructed by his supervisors that the permitted area, while normally public property, became private property by virtue of the permit. He also testified that outside the barricaded area, "there was enough room for people to get around without" stepping into traffic. (Id. ¶¶ 21, 22).

7

Apart from the Festival, Plaintiffs visit Nashville frequently and generally have had positive interactions with the MNPD and Lt. Corman. (Doc. No. 69, ¶ 25). They have never been cited for violating Metro's special events ordinance or any other Metro ordinance. (Id. ¶ 20). On multiple occasions, MNPD officers have instructed bystanders who were angry over Plaintiffs' message that Plaintiffs have a First Amendment right to express their views. (Id. ¶ 26).

## II. Standard of Review

The standards governing summary judgment have been restated on countless occasions and are well known. It suffices to note: (1) summary judgment is only appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a); (2) the facts and inferences must be construed in favor of the nonmoving party, Van Gorder v. Grand Trunk W. R.R., Inc., 509 F.3d 265, 268 (6th Cir. 2007); (3) the Court does not weigh the evidence, or judge the credibility of witnesses when ruling on the motion, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); and (4) the mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment, Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). Furthermore, "[t]he standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." Ferro Corp. v. Cookson Group, PLC, 585 F.3d 946, 949 (6th Cir. 2009).

## III. Analysis

### A.

The First Amendment prohibits the government from "abridging the freedom of speech." U.S. Const. Amend. 1. "To determine the constitutionality of a government restriction on speech

on publicly-owned property, [a court must] consider three questions: (1) whether the speech is protected under the First Amendment; (2) what type of forum is at issue and, therefore, what constitutional standard applies; (3) whether the restriction on speech in question satisfies the constitutional standard for the forum." Miller v. City of Cincinnati, 622 F.3d 524, 533 (6th Cir. 2010) (citing S.H.A.R.K. v. Metro Parks Serving Summit County, 499 F.3d 553, 559 (6th Cir. 2007)).

Although the First Amendment "offers sweeping protection that allows all manner of speech to enter the marketplace of ideas," Bible Believers v. Wayne Cty., 805 F.3d 228, 243 (6th Cir. 2015), "[s]imply because the government may own a piece of property . . . does not mean that property is open to all types of expressive activity at all times." Miller v. City of Cincinnati, 622 F.3d 524, 533 (6th Cir. 2010). This is because "'[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use which it is lawfully dedicated.'" Id. (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 (1983)). Even so, "the government does not have a free hand to regulate private speech on government property." Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 469-70 (2009). Rather, a "forum analysis" is used "to determine when a governmental entity, in regulating property in its charge, may place limitations on speech." Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez, 561 U.S. 661, 679 (2010).

The Supreme Court has identified three types of fora: the traditional public forum, the designated public forum, and the nonpublic forum. Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 800 (1985). "Traditional fora are those that have long been devoted to assembly and debate 'by . . . tradition or by government fiat,' Perry Educ. Ass'n v. Perry Local Educators'

9

Ass'n, 460 U.S. 37, 45, 103 S. Ct. 948, 74 L. Ed.2d 794 (1983), such as sidewalks and public parks." Helms v. Zubaty, 495 F.3d 252, 255 (6th Cir. 2007). "The government can also designate a forum 'for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects,' Cornelius, 473 U.S. at 802, 105 S. Ct. 3439, such as open school board meetings or university spaces made available for uses typical of public fora." Id. at 255-56. "[B]y contrast, a nonpublic forum is a publicly-owned property that is not by tradition or governmental designation 'a forum for public communication,'" and includes, "for example . . . the reception area of a judge's office[.]" Miller, 622 F.3d at 535 (citing Helms, 495 F.3d at 256-57).

The nature of the forum also dictates the permissible level of restriction. "Restrictions on speech in a traditional public forum receive strict scrutiny; the government may exclude a speaker from a such forum 'only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.'" Id. at 534 (quoting Cornelius, 473 U.S. at 800). "Government restrictions on speech in a designated public forum are subject to the same strict scrutiny as restrictions in a traditional public forum." Pleasant Grove, 555 U.S. at 469-70. Finally, "a nonpublic forum by definition is not dedicated to general debate or the free exchange of ideas," and, therefore, "[t]he First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose." Cornelius, 473 U.S. at 811.

Against this backdrop, the answers to the first two questions regarding the constitutionality of Metro's restriction on Plaintiffs' speech at the Festival are easily answered. Regardless of one's views on the issues about which Plaintiffs' preached, Supreme Court "precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the

10

Free Speech Clause as secular private expression." Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 761 (1995) (collecting cases). "Indeed, in Anglo-American history, at least, government suppression of speech has so commonly been directed precisely at religious speech that a free-speech clause without religion would be Hamlet without the prince." Id. Further, Plaintiffs' attempted to vocalize their beliefs on a public sidewalk in a public park, which are "quintessentially public fora." Logsdon v. Hains, 492 F.3d 334, 345 (6th Cir. 2007) (citing Perry Educ. Ass'n, 460 U.S. at 45).

More difficult is the answer to the question of whether requiring Plaintiffs to move off the permitted plaza area and to an adjacent public sidewalk outside the permitted area was constitutional.[4] The Court finds that it was.

**B.**

"Restrictions on speech in traditional public fora must either be (1) reasonable time, place, and manner regulations or (2) 'narrowly drawn to accomplish a compelling governmental interest.'" Saieg v. City of Dearborn, 641 F.3d 727, 734 (6th Cir. 2011) (quoting United States v. Grace, 461 U.S. 171, 177 (1983)). "In general, then, 'the government's ability to permissibly restrict expressive conduct on public streets and sidewalks 'is very limited.'" Id.; see Capital Square, 515 U.S. at 761 (stating that in a public forum a state "may impose reasonable, content-neutral time, place, and manner restrictions . . . but it may regulate expressive content only if such a restriction is necessary,

---

[4] The Court notes that Plaintiffs eventually moved to a median, but this was not a traditional public forum. In fact, Peters conceded in his deposition that the median was part of a crosswalk, (Doc. No. 68-2, Peters Dep. at 45), and the parties agree that there were no benches, plaques or displays on the median. Cf. Satawa v. Macomb Cty. Rd. Comm'n, 689 F.3d 506, (6th Cir. 2012) (finding that county road median was traditional public forum where it was landscaped, contained park benches and historical displays, was used by citizens "for a variety of expressive purposes," and that "in other words, ha[d] features that invite[]d the public to spend time there.").

11

and narrowly drawn, to serve a compelling state interest.").

In this case, Metro posits Plaintiffs position as being that "their First Amendment rights were violated because they did not get to stand where they wanted to stand to preach during Pride Festival and were instead moved outside of the permitted area and across the street from the Festival." (Doc. No. 55 at 10). With this premise, Metro characterizes the question before this Court as being "straightforward: must Plaintiffs' First Amendment rights be allowed to trump those of Nashville Pride, an organization with it own expressive message, when Nashville Pride sought to share and communicate that message at Pride Festival, an event for which it had obtained a permit[?]" (Doc. No. 70 at 1). Insisting that the Third Circuit in <u>Startzell v. City of Philadelphia</u>, 533 F.3d 183 (3rd Cir. 2008) "answered this very inquiry," Metro submits that "the answer to th[e] question is a resounding no[.]" <u>Id.</u>

For their part, Plaintiffs insist that "the viewpoint of [their] message is the core issue in this case," and that Metro's argument is "disingenuous" and "belittles Plaintiffs' legal position" because "the facts here are that Plaintiffs 'wanted to stand' in a **traditional public forum**, where all citizens are constitutionally permitted to stand and express protected speech." (Doc. No. 71 at 3) (emphasis in original). They submit that Metro's command moving them across the street was not content-neutral, did not serve a significant government interest, nor was it narrowly tailored. Plaintiffs argue that <u>Saieg</u> "is remarkably similar to the instant case," and rely as well on the Sixth Circuit's opinions in <u>Bible Believers</u> and <u>Parks v. City of Columbus</u>, 395 F.3d 643 (6th Cir. 2005), among others.

Although the cases cited by Plaintiffs collectively lend support to their position, those cases are distinguishable in salient aspects. For example, they rely on <u>Saieg</u> for the proposition that requiring them "to move across the street from the entrance of the Festival . . . does not serve a

12

significant government interest." (Doc. No. 68 at 4). However, in Saieg "a group of Christians whose goal is to convert Muslims to Christianity," 641 F.3d at 729, challenged restrictions at the Arab International Festival in Dearborn, Michigan that permitted leafleting only from a stationary booth and otherwise banned leafleting, both at the Festival and on surrounding sidewalks and roads. While the Sixth Circuit found that the restrictions did not further a significant public interest even though the city argued that the regulation help to insure crowd control, "Saieg involved restrictions on streets and sidewalks covering a number of city blocks that remained open to every-day pedestrian traffic during [the] festival," and "'[c]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation.'" Bays v. City of Fairborn, 668 F.3d 814, 823 (6th Cir. 2012) (quoting Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 648 (1981); see Johnson v. Minneapolis Park & Recreation Bd., 729 F.3d 1094, 1100 (8th Cir. 2013) (observing "that city's interest in curtailing expression on sidewalks was 'not substantial,' where sidewalks remained open to the public during a festival, and were not restricted to attendees paying an admission fee"); Ascherl v. City of Issaquah, 2011 WL 4404145, at *4 (W.D. Wash. Sept. 21, 2011) (citing Saieg for the proposition that "the government's interest in crowd control and safety is undermined when it leaves adjacent sidewalks open for typical non-Festival pedestrian traffic and sidewalk vendors that create just as much, if not more, congestion as compared to literature distribution"). Critically, Saieg dealt only with restrictions on leafleting and did not address the First Amendment Rights of permit holders *vis-a-vis* those who might seek to offer a competitive message to that of the permit-holder's expressive message.

Bible Believers, too, involved the Dearborn Arab Festival, albeit in the context of the "'heckler's veto,'" which "occurs when police silence a speaker to appease the crowd and stave off

13

a potentially violent altercation." 805 F.3d at 234 (footnote omitted). The "case call[ed] on [the Sixth Circuit] to confirm the boundaries of free speech protections in relation to angry, hostile, or violent crowds that seek to silence a speaker with whom the crowd disagrees," where "a group of self-described Christian evangelists preach[ed] hate and denigration to a crowd of Muslims, some of whom responded with threats of violence," and "[t]he police thereafter removed the evangelists to restore the peace." Id. Here, of course, the Court is not dealing with a true "heckler's veto," because Plaintiffs were allowed to preach the message they desired for 4-5 hours. On this score, it is significant that Bible Believers did not address whether proselytizers have a right to stand in a particular permitted place to preach. Indeed, the plaintiffs in that case "were directed to a protected area on the Festival grounds referred to as a 'free speech zone'" on one day (but not the next), id. at 236, yet did not argue that this zone that was designated by the city somehow violated their First Amendment rights. Parks is closer to this case because it involved the issuance of a "block party permit" for the Columbus Arts Festival and an order that plaintiff move outside the barricaded area, but is different and, in some respects, more like Saieg because it involved an attempt by plaintiff to distribute leaflets while wearing a sign bearing a religious message. More specifically, the plaintiff in Parks was peacefully passing out leaflets in a venue where it was "unclear that the [organizer] was actually expressing a particular message[.]" 395 F.3d at 651. Even though the Sixth Circuit found that the permitted streets in Columbus remained a traditional public forum, it expressly noted that the case before it did not "involve circumstances where the speaker attempted to interfere with the expressive message conveyed by the permit-holder." Id. at 649.

## C.

Startzell, on the other hand, involved such circumstances. Being out-of-circuit, it is not

14

controlling authority, but it is instructive because it was tethered to controlling Supreme Court precedent, and was decided on facts analogous to those here.

In Startzell, a gay pride festival (named OutFest) was held on city property in the form of a "'National Coming Out Day' on behalf of the lesbian, gay, bisexual, and transgendered community" in Philadelphia. 533 F.3d at 188. There, like here, evangelists "entered the area assigned to [the festival] with large signs [and] bullhorns . . . seeking to proclaim their message that homosexuality is a sin." Id.[5] There, like here, the festival organizers had "obtained a permit from the City of Philadelphia to close off the streets in which OutFest took place," although, unlike here, "[a]ll the events were free and open to the public." Id. And there, like here, after protesters were directed by police "to move to a less disruptive location," id., they filed suit, challenging that directive on First Amendment ground.

On appeal from the grant of summary judgment in favor of the city, the Third Circuit began its substantive discussion by setting forth what it was not holding, to wit, merely because a permit was issued by the city, the event organizers did not have "a correlative right to exclude from the OutFest those who hold contrary, indeed antagonistic, viewpoints." Id. at 192. In support of that ruling, the Third Circuit quoted Parks for the proposition that "[t]he city cannot claim that one's constitutionally protected rights disappear [where] a private party is hosting an event that remained free and open to the public." Id. at 198 (quoting Parks, 395 F.3d at 652). The court then went on to note that, "like the Arts Festival in Parks, Outfest took place in the streets and sidewalks of Philadelphia, an undisputed quintessential public forum" and that "[t]he issuance of a permit to use

---

[5] The protestors were lead by Michael Marcavage of Repent America. In addition to signs and bullhorns, the protestors used microphones and musical instruments. Id.

15

a public forum does not transform its status as a public forum." Id.

It was at this point that the Third Circuit turned to address the question that was specifically unaddressed in Parks – the circumstance where a speaker attempts to interfere with the expressive message of the permit-holder. The Startzell court wrote:

> As the Supreme Court has stated, "[t]he principles of the First Amendment are not to be treated as a promise that everyone with opinions or beliefs to express may gather around him at any public place and at any time a group for discussion or instruction." Poulos v. New Hampshire, 345 U.S. 395, 405, 73 S. Ct. 760, 97 L. Ed. 1105 (1953). Indeed, "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." Cornelius, 473 U.S. at 799-800, 105 S. Ct. 3439. Therefore, although the ability of the state to limit expressive activity in a traditional public forum is "sharply circumscribed," Perry, 460 U.S. at 45, 103 S. Ct. 948, the state remains free to take action to maintain public order. <u>It follows that although Appellants cannot be excluded from the streets and sidewalks of Philadelphia where OutFest took place, they are not free to proceed as they like through the permit area</u>.
>
> Even in a traditional public forum, the government may impose content-neutral time, place, or manner restrictions provided that the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed.2d 661 (1989) (citation and internal quotations omitted). <u>Thus, the City had the authority to regulate Appellants' First Amendment activities where necessary</u>.

533 F.3d at 196-97 (footnote omitted) (emphasis added).

The court in Startzell next went on to discuss whether the restriction was content neutral, which is a primary bone of contention in this case as well.[6] After discussing various Supreme Court

---

[6] *At oral argument, Plaintiffs' counsel repeatedly claimed that the directive to move was content based, relying upon Lt. Corman's pre-festival email, and the fact that others were not asked to move from the Bike Check area where Plaintiffs' first began preaching. However, and as noted previously, Lt. Corman simply stated that Plaintiff would need to preach from across the street because "[t]he organizers secured a sidewalk lane and road closure[.]" (Doc. No. 67 ¶ 45). He did not say that Plaintiffs needed to*

16

cases dealing with content neutrality, the Third Circuit stated that "[p]ermits allow the government to arrange a public forum 'so that individuals and groups can be heard in an orderly and appropriate manner,'" that "'*enforcement* of a permit system inevitably requires taking cognizance of content,'" and that "[t]he principle of content neutrality does not divest police officers of the ability to enforce valid permits and to ensure that permitted speech is allowed to take place." Id. at 198 (quoting Kroll v. U.S. Capitol Police, 847 F.2d 899, 903 (D.C. Cir.1988) (emphasis in original)). In relation to the particular facts before it, which "was different in kind and degree from that in Parks, where a demonstrator was removed from a nonexclusive Arts Festival which had a permit," the Third Circuit went on to write:

> The right of free speech does not encompass the right to cause disruption, and that is particularly true when those claiming protection of the First Amendment cause actual disruption of an event covered by a permit. The City has an interest in ensuring that a permit-holder can use the permit for the purpose for which it was obtained. This interest necessarily includes the right of police officers to prevent counter-protestors from disrupting or interfering with the message of the permit-holder. Thus, when protestors move from distributing literature and wearing signs to disruption of the permitted activities, the existence of a permit tilts the balance in favor of the permit-holders. . . .
>
>      \*        \*        \*
>
> As we noted earlier . . . Appellants did not simply carry their signs or distribute leaflets but used loud bullhorns to express their message near the stage area, directly addressed an OutFest attendee in a confrontational manner, and blocked access to the vendor booths. Because Appellants were interfering with the permitted event's message, something the other OutFest attendees were not doing . . . the police officers were justified in directing Appellants' movement away from the stage and the vendors.

---

*be across the street because they had a different viewpoint from the event organizers. Additionally, when Crowe first told Plaintiffs to move, he said it was because the area was permitted. As for others not being asked to move, it is undisputed that this was an area for lines to form, and for people to meet others who were either going into or leaving the Festival. Regardless, and contrary to Plaintiffs' assertion, a restriction based upon content does not automatically become a First Amendment violation.*

17

Id. at 197-99.

There obviously are many similarities between the facts presented here and those in Startzell, but, just as with any two cases, there are differences. Most notably from Plaintiffs' perspective are the facts that the protesters in Startzell were (1) "inside the Festival," (2) "standing twenty yards from the main stage, where a musical program was going to begin, 'singing loudly, playing instruments, displaying large signs, and using microphones and bullhorns,'" and (3) "[a]fter moving from that location . . . stood still in the middle of the street, blocking vendor booths." (Doc. No. 68 at 9) (quoting Startzell, 533 F.3d at 190-91). The critical question is whether those factual differences warrant a contrary outcome. The Court finds that they do not.

**D.**

Coincidentally enough, those same differentiating facts were presented to the Third Circuit in a case following Startzell, involving Marcavage and his group of protestors at gay pride and other festivals in Philadelphia. In Marcavage v. City of Philadelphia, 481 F. App'x 742, 742-43 (3d Cir. 2012), an unpublished opinion, the court was faced with a First Amendment challenge that arose when the protestors were moved "'40 to 50 feet away' from where they wanted to stand," after they "vocally condemned homosexuality" and the "event participants reacted by 'shouting at, debating with, trying to surround, and getting physically close to'" plaintiffs. Upholding the district court's grant of summary judgment to the city, the Third Circuit addressed plaintiff's attempt to distinguish Startzell on the ground that (1) "Startzell involved ... a group of demonstrators [who] were removed from within a permitted event," while "Marcavage was not even inside of the event area," and (2) there was no evidence that Marcavage did anything to disrupt the event, whereas in Startzell, the demonstrators "used loud bullhorns to express their message near the stage area, directly addressed

18

an Outfest attendee in a confrontational manner, and blocked access to the vendor booths." (Id. at *4). Rejecting those arguments, the Third Circuit wrote:

> Marcavage would limit Startzell's holding to the boundary of a permitted event, so that counter-protestors could freely disrupt an event so long as they never set foot within it. This would completely eviscerate Startzell, as counter-protestors could completely block the entrance to an event, or direct amplified sound from the perimeter of the event so as to drown out event speakers. Startzell identifies as a significant governmental interest the ability of the City to ensure "that a permit-holder can use the permit for the purpose for which it was obtained." . . . This interest does not end at the physical border of the permitted event.
>
> We also disagree that "there is no evidence in this case that Marcavage did anything to disrupt the event." . . . While the disruption he caused in Startzell may have been greater than here, this is merely a difference of degree. At each event in question Marcavage attracted agitated crowds. . . . In any event, police officers are not required to wait for actual disorder before imposing minimal restrictions. As the Eighth Circuit noted in ACORN v. St. Louis County, "[t]he government need not wait for accidents to justify safety regulations." 930 F.2d 591, 596 (8th Cir.1991).

(Id. at *4-5).

This case is much closer to Startzell and Marcavage than it is to Saieg, Parks or any of the other Sixth Circuit cases relied upon by Plaintiffs, and the Court agrees with the rationale expressed in the former cases given the specific facts presented here. Furthermore, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired," Heffron, 452 U.S. at 647, and "restrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'" Ward, 491 U.S. at 797.

In this case, the facts are undisputed that Plaintiffs continued to preach with bullhorns for some four to five hours during the Festival and their message was heard loud and clear by those passing by. While they may have wanted to preach on permitted Festival ground instead of on the perimeter, the Court's "task is to strike a balance between the rights" of event organizers and

counter protestors, "while at all times remaining true to the essence of the First Amendment," Startzell, 533 F.3d at 188. The balance in this case tips in favor of Metro.[7]

## IV. Conclusion

On the basis of the foregoing, Metro's Motion for Summary Judgment will be granted and Plaintiffs' cross-Motion will be denied.

An appropriate Order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

---

[7] As an alternative basis for dismissal, Metro argues that it does not have an unconstitutional custom, policy, or practice that caused a violation of Plaintiffs' rights, but correctly concedes that "this Court need not even reach the issue" if no constitutional violation occurred. (Doc. No. 66 at 12). See Watkins v. City of Battle Creek, 273 F.3d 682, 685-86 (6th Cir. 2001) ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983"); City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."). To complete the record and for purposes of any appeal, however, the Court rejects Metro's argument. Not only did Lt. Corman, acting on behalf of Metro, inform Plaintiffs via email that they had to preach from across the street, Comprehensive was advised of the email and it was distributed to security officers by Poteete. Moreover, the security plan was approved by Metro and, while Comprehensive officers were not employed by MNPD, they wore uniforms identifying them as police officers and Crowe "'purport[ed] to exercise official authority,'" Parks, 395 F.3d at 652 (citation omitted) when he told Plaintiffs to move.